[No. B002438. Second Dist., Div. Four. May 4, 1988.]

ISAAC B. YOUNGBLOOD et al., Plaintiffs and Respondents, v. DARYL GATES, as Chief of Police, etc., et al., Defendants and Appellants.

**COUNSEL**

James K. Hahn, City Attorney, Lewis N. Unger and Byron R. Boeckman, Assistant City Attorneys, and Linda K. Lefkowitz, Deputy City Attorney, for Defendants and Appellants.

John Hager and Paul L. Hoffman for Plaintiffs and Respondents.

**OPINION**

**ROTHMAN, J.**\*—In this action for injunctive and declaratory relief against a number of governmental entities and individuals in their official capacities,[1] plaintiffs allege that persons arrested in the City of Los Angeles are not being arraigned before a magistrate without "unnecessary delay" in violation of constitutional and statutory requirements. They further challenge the conditions of prearraignment confinement in city jails, including deprivation of visitation rights, reading materials, recreational opportuni-

---

\* Assigned by the Chairperson of the Judicial Council.

[1] The defendants include, among others, the Chief of Police of the City of Los Angeles, the Sheriff of Los Angeles County, the City of Los Angeles, the County of Los Angeles, and the Los Angeles Municipal Court.

ties, and proper hygiene. Finally, the complaint charged the city with inadequate identification and treatment of mentally ill arrestees.

## PROCEDURAL HISTORY

On June 7, 1977, Isaac Youngblood, an indigent being held in prearraignment confinement as a result of arrest by Los Angeles police officers, together with individual taxpayers, filed a class action. Their complaint underwent several amendments. A second class action suit by other individuals raising similar issues was filed November 7, 1980. On February 9, 1981, these two actions were ordered consolidated for the purpose of trial.

A court trial began on October 25, 1982, and concluded on December 10, 1982. The court heard many witnesses, received hundreds of exhibits, and visited jail facilities operated by the City of Los Angeles.

On March 9, 1983, the court filed a 96-page memorandum opinion. This opinion was later revised and became the court's statement of decision. Judgment was filed on September 6, 1983, and timely notice of appeal by all parties followed.

The appeals from those portions of the judgment affecting the municipal court and the sheriff's department were later abandoned, as was the appeal taken by respondents, plaintiffs below. The remaining appeal concerns only those portions of the judgment affecting the operations of the Los Angeles Police Department.

## ISSUES ON APPEAL

The following issues are raised in this appeal:

1. The meaning of the maximum "two day" delay provision of Penal Code section 825;

2. Whether certain practices of the Los Angeles police constitute "unnecessary delay" within the maximum two-day provision;

3. The propriety of certain policies for treatment of prearraignment arrestees in Los Angeles City jails.

## DISCUSSION

### I. *Arraignment Delay*

Included in the constitutional right of an accused person to a speedy and public trial (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) is the

right of a person in police custody to be promptly brought before a magistrate and formally charged. To this end, article I, section 14 of the California Constitution requires: "A person charged with a felony by complaint . . . shall be taken without unnecessary delay before a magistrate. . . ." Further, Penal Code section 849, subdivision (a) provides: "When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate. . . ."

The right to a speedy appearance before a magistrate is implemented by Penal Code section 825: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following."

The trial court was called upon to rule on two aspects of the right to be brought before a magistrate "without unnecessary delay": (a) the meaning of the "two day" outer limit established by Penal Code section 825 and, (b) unnecessary delays within the "two day" period.

### A. *Meaning of the Two-day Rule*

The Los Angeles Police Department has established guidelines, referred to as the "due-out schedule," regarding the maximum two-day period set out in Penal Code section 825. (See exhibit 8 in the trial, which we have reproduced here in the appen. to this opn.) According to appellants, this schedule is used by Los Angeles police officers to determine the maximum time by which an in-custody arrestee must be arraigned, and assumes that the maximum arraignment time under Penal Code section 825 is to be calculated from the precise time of an individual's arrest, rather than the calendar date of arrest. The city interprets "two days" as "48 hours."

After careful analysis of all the applicable authorities, the trial court concluded: "the LAPD interpretation is in error. The correct rule is that a defendant arrested at any time on one day must be arraigned on the second court day thereafter." In essence, the trial court gave a strict construction to the words "two days" in the statute. We agree.

While the distinction might seem minor, the difference between the two interpretations posed in this case can be significant, as illustrated in this example: if the accused is arrested at 11 p.m. on Thursday, under the Los

Angeles Police Department "due-out schedule," he or she is "due out" to court by next Tuesday at 4 p.m. This calculation can be explained as follows:

Thursday: 11 p.m.—arrest.

Friday: 11 p.m. equals 24 hours.

Saturday: This day is excluded as a municipal court "holiday" pursuant to Government Code section 71345.

Sunday: This day is excluded by Penal Code section 825.

Monday: 48 hours expires at 11 p.m. Since court is not in session at 11 p.m., the schedule gives the police until the end of the next court day.

Tuesday: Must be arraigned by the close of court at 4 p.m. during this day.

By contrast, under the trial court's interpretation of the "two day" rule, the first court day following the arrest would be Friday, and the arrestee would have to be arraigned sometime during the second court day—Monday—rather than Tuesday. The effect of the Los Angeles Police Department guidelines is an expansion of permissible custodial time before arraignment.

This expansion of time is contrary to the clear language of Penal Code section 825. That section expressly requires that an arrestee be arraigned within "two days" and not "48 hours." This is not simply a legislative oversight as the Legislature has used the term "48 hours" rather than "two days" when it wished to do so.[2] In addition, when the Legislature amended Penal Code section 825 in 1961, instead of then changing the language to "48 hours," it reused the words "two days" in the amendment. ■ "It is assumed that the Legislature has in mind existing laws when it passes a statute. [Citations.] 'The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended.' [Citations.]" (*Estate of McDill* (1975) 14 Cal.3d 831, 837-838 [122 Cal.Rptr. 754, 537 P.2d 874]; *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977 [140 Cal.Rptr. 669, 568 P.2d 394].)

---

[2] See Penal Code section 824 which uses "48 hours" in reference to arraignment of an adult misrepresenting himself or herself to be a minor.

For this court to replace the words "two days" in Penal Code section 825 with the words "48 hours" would amount to a "judicial amendment" where the Legislature has not so amended this statute. This is not our function. ▓ "In the absence of compelling countervailing considerations, we must assume that the Legislature 'knew what it was saying and meant what it said.' [Citation.]" (*Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].)

▓ There are no "compelling countervailing considerations" in the instant case, and, in light of settled case authority on the subject of prearraignment delay, Penal Code section 825 must be interpreted to avoid expansion of custodial time. ▓ In *People* v. *Powell* (1967) 67 Cal.2d 32, 60 [59 Cal.Rptr. 817, 429 P.2d 137], the Supreme Court held that: "The principal purposes of the requirement of prompt arraignment are to prevent secret police interrogation, to place the issue of probable cause for the arrest before a judicial officer, to provide the defendant with full advice as to his rights and an opportunity to have counsel appointed, and to enable him to apply for bail or for habeas corpus when necessary."

The right to be brought before a magistrate without unnecessary delay is fundamental. As Mr. Justice Frankfurter said for the court in *McNabb* v. *United States* (1943) 318 U.S. 332, 343 [87 L.Ed. 819, 825-826, 63 S.Ct. 608]: "The purpose of this impressively pervasive requirement [requiring arrested persons to be promptly taken before a committing authority] of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. . . . Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary."

▓ Moreover, in previous cases, the California Supreme Court has expressly applied a two-calendar-day rule in computing the permissible time before arraignment under Penal Code section 825. In one example, *People* v. *Powell, supra,* 67 Cal.2d 32, the defendant was arrested shortly after 1:10 a.m. on a Sunday and was arraigned the following Wednesday. Under appellants' interpretation of Penal Code section 825, this would have been within the 48 hour arraignment limit. The Supreme Court, however, followed a strict two-day rule, and said: ". . . Powell and Smith were arrested on Sunday, March 10, 1963, but were not taken before a magistrate and arraigned until Wednesday, March 13. Even if the Sunday is not included in the computation, these defendants were therefore held by the police for three days before they were arraigned, advised of their rights and furnished with counsel as the law requires. [Citation.] That delay 'violates a

fundamental right of the arrested person and is in disobedience of the law.' [Citation.] We have characterized such conduct by the police as 'patently illegal,' and have rejected the argument that its illegality is somehow lessened by the fact that 'similar conduct is not unusual' or 'makes the work of the police and the district attorney easier.' [Citation.] Indeed, we have further stressed that section 825 does not authorize even a two-day detention in all cases, 'but, instead, places a limit upon what may be considered a necessary delay, and a detention of less that two days, if unreasonable under the circumstances, is in violation of the statute.' [Citation.]" (*People* v. *Powell, supra,* 67 Cal.2d at p. 59.)

Appellants argue, however, that the above statement in *Powell* is "dictum" since the court did not base its ultimate ruling in the case on the "unnecessary delay" issue, but rather reversed the conviction because the police obtained incriminating statements without warning the defendants of their constitutional rights as required by *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. It is true that the determinations in *Powell* on the meaning of Penal Code section 825 were not the ratio decidendi of the case, i.e., "the principle or rule which constitutes the ground of the decision, and it is this principle or rule which has the effect of a precedent." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, p. 753.) This does not, however, mean that the Supreme Court's pronouncement on this subject, even though in the form of dictum, is to be ignored.

The *Powell* case was not the first time the Supreme Court gave this interpretation to the two-day rule. In *People* v. *Hall* (1964) 62 Cal.2d 104 [41 Cal.Rptr. 284, 396 P.2d 700], the defendant was arrested at 9:30 p.m. on a Sunday. He was arraigned the following Wednesday. In a footnote to the opinion, the Supreme Court commented: "By failing to take the defendant before a magistrate 'within two days after his arrest, excluding Sundays and holidays' (Pen. Code, § 825), the officers exceeded the maximum period during which a defendant may be lawfully detained." (*People* v. *Hall, supra,* 62 Cal.2d at p. 108, fn. 6.)

The Supreme Court subsequently, and emphatically adhered to *Powell* in *People* v. *Pettingill* (1978) 21 Cal.3d 231, 243 [145 Cal.Rptr. 861, 578 P.2d 108]: "Over a decade ago we firmly condemned police violations of the letter and spirit of these laws [including Pen. Code, § 825] in the case of *People* v. *Powell* [*supra*] 67 Cal.2d [at pages] 58-60. There the defendants were held in police custody for some three days prior to arraignment, during which time they were repeatedly questioned and made self-incriminating statements. We ruled the statements inadmissible because obtained

in violation of the then-governing standards of custodial interrogation (*Escobedo* v. *Illinois* [*supra*] 378 U.S. 478; *People* v. *Dorado* [*supra*] 62 Cal.2d 338); . . . . But our admonitions in *Powell* on the subject of unnecessary delay in arraignment remain pertinent today—and in view of the police practices shown by the record herein, they bear repeating. That delay, we said, ' "violates a fundamental right of the arrested person and is in disobedience of the law." [Citation.] We have characterized such conduct by the police as "patently illegal," and have rejected the argument that its illegality is somehow lessened by the fact that "similar conduct is not unusual" or "makes the work of the police and the district attorney easier." [Citation.] Indeed, we have further stressed that section 825 does not authorize even a two-day detention in all cases, "but, instead, places a limit upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute." [Citation.]' "

■ If the language of *Powell* is dictum, it is a compelling policy of the Supreme Court which should not be ignored, and in view of *Pettingill* cannot be ignored. (See *Jaramillo* v. *State of California* (1978) 81 Cal.App.3d 968, 971 [146 Cal.Rptr. 823].)

■ *Powell* and *Hall* were correctly applied by the trial court, and we adopt its holding: "[T]he emphasis in interpretation of section 825 is on 'days,' not hours. An in-custody defendant, in this court's opinion, must be ar- raigned on the second court day following his arrest, whatever the time of day or night of the arrest. Thus, a defendant arrested any time Monday must at the outside be arraigned on Wednesday. A defendant arrested at any time on a Friday, Saturday, or Sunday must, at the outside, be arraigned on a Tuesday. A defendant arrested at any time on a Thursday must be arraigned at the outside on Monday. If a holiday intervenes on a day other than a Saturday or Sunday, the outside limit is extended one day."

None of the arguments advanced by appellants diminish the correctness of the trial court's ruling. First, appellants argue that this construction of Penal Code section 825 would render the language added to the section by the Legislature in 1961 a nullity, and therefore they urge that the interpretation by the trial court cannot be correct under the maxim of legislative construction: "Words must be construed in context, and statutes must be harmonized, . . . internally . . . to the extent possible. [Citations.] Interpretive constructions which render some words surplusage, . . . are to be avoided." (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) In 1961, the Legislature amended Penal Code section 825 by adding this parenthetical language in the first paragraph: ". . . provided, however, that when the two days

prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following." Appellants say that since the first half of this paragraph already excludes "Sundays and holidays," the amendment would be a nullity unless it was intended to make clear that "two days" means "48 hours." The argument fails because the additional language added in 1961 is not surplusage under the interpretation we have adopted. A magistrate might not be sitting for reasons other than the existence of a holiday or a Sunday. For example a magistrate in a district which has only one judge or justice, or magistrate "on call" under Penal Code section 810, might be unexpectedly ill, or absent for some reason.

Appellants cite the court to "legislative history" that they contend supports the view that the two-day rule was intended to be a 48-hour rule.[3] But "[j]udges may not construe a statute to ascertain the legislative intent behind the statute unless there is some ambiguity or uncertainty on the face of the statute. [Citation.]" (*Agricultural Labor Relations Bd.* v. *Tex-Cal Land Management, Inc.* (1985) 192 Cal.App.3d 1530, 1538 [243 Cal.Rptr. 505].) Since we find no ambiguity or uncertainty, it would be inappropriate to examine legislative intent. In any event, the only item of significance submitted on the subject of legislative history is a letter from the author of the bill, which merely offers one legislator's statements as to his understanding of the bill. These statements are not admissible to construe the statute because they are not a "reiteration of legislative discussion and events leading to adoption" of the legislation. (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 900 [231 Cal.Rptr. 213, 726 P.2d 1288]; see *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) The declaration of individual legislator's motives and views "is the weakest and most unreliable kind of indicator as to what the Legislature as a whole intended." (*Cadiz* v. *Agricultural Labor Relations Bd.* (1979) 92 Cal.App.3d 365, 379 [155 Cal.Rptr. 213].)[4]

---

[3] Appellants' request that the court take judicial notice of certain items of legislative history was granted on July 23, 1987, without objection.

[4] Reference is made in the dissent to a transcript of the Assembly Interim Committee on Criminal Procedure hearings in February of 1960. This was not one of the matters of legislative history for which respondents sought judicial notice. These hearings were conducted almost a year before the introduction of Senate Bill No. 550, which amended Penal Code section 825. The subject of that amendment was not the subject of the 1960 interim hearings. They were for the purpose of hearing testimony on how changes made in the law of arrest in 1957 were working and whether any changes in those laws were warranted. The references by witnesses and legislators to "48 hours" in those hearings are not appropriate matters to show legislative intent on a bill introduced a year later, or on statutes enacted years earlier. To the extent *F & P Growers Assn.* v. *Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667, 678 [214 Cal.Rptr. 355], *Post* v. *Prati* (1979) 90 Cal.App.3d 626, 634 [153 Cal.Rptr. 511], and

As we have already pointed out, this is not a case of first impression after the amendment of Penal Code section 825 in 1961. Since the Supreme Court, following the enactment of the amendment, wrote in *Hall* and *Powell* on this subject, we are not free to ignore its expression.

Finally, appellants direct us to three intermediate appellate decisions to support their interpretation of Penal Code section 825, all of which are distinguishable or inapposite.

In *People* v. *Ross* (1965) 236 Cal.App.2d 364, 367-368 [46 Cal.Rptr. 41], defendants were arrested in the early morning hours on a Friday and arraigned in the afternoon of Monday. The court held that "defendants were taken before a magistrate and arraigned on the afternoon of the next regular court session on the second legal business day following the day of their arrest. Excluding Saturday and Sunday, the 48-hour statutory minimum would have expired at 3:30 a.m. on Tuesday, May 12, 1964; thus, defendants were brought before a magistrate 'within two days after [their] arrest, excluding Sundays and holidays.'" Although the court used "48-hour" language, the defendants were arraigned well within the statutory time regardless of how the court explained its calculation. The additional comment of the court—that the time expired the next day—was unnecessary to the decision.

In *People* v. *Chambers* (1969) 276 Cal.App.2d 89, 103 [80 Cal.Rptr. 672], the defendant was arrested "shortly before midnight on Thursday," and was arraigned on Tuesday afternoon. The court held that since "Saturday and Sunday are municipal court holidays, the 48-hour time limit prescribed by section 825 of the Penal Code expired just before 12 midnight on Monday, June 12. Because court was not then in session, they were properly arraigned on Tuesday afternoon." Although the court cited *Powell,* it attempted no analysis of the conflict we face here.

In *People* v. *Lee* (1970) 3 Cal.App.3d 514, 521 [83 Cal.Rptr. 715], the defendant was arrested on a Saturday, but not arraigned until Wednesday. The issue in that case was whether a statement taken from the defendant on Monday and Tuesday afternoons were obtained beyond the two-day period for arraignment. Lee argued that he should have been arraigned on Monday morning. Although the court, relying on *Chambers* and *Ross,* stated that a Wednesday arraignment was proper, this was unnecessary to the opinion, since under any interpretation of Penal Code section 825 the statements were taken within the two-day period.

---

*Cadiz* v. *Agricultural Labor Relations Bd., supra,* 92 Cal.App.3d at page 379, permit consideration of remarks at hearings by legislators as "legislative history," such remarks would certainly have to be focused on the history of a particular statute.

These and other cases[5] use inconsistent language to describe the statutory two-day period. However, none of the cases using "48 hour" terminology analyze or explain the problems posed in the instant case. As we have noted, under these circumstances the strong guidance of the Supreme Court must take precedence over the language of intermediate appellate decisions.

### B. *Unnecessary Delays Within the Two Days*

The trial court also made a number of rulings regarding alleged unreasonable delays within the two-day maximum time for arraignment. We summarize here the facts relevant to our discussion addressing those of the court's rulings which are contested on appeal.[6]

The trial court found that men arrested by the Los Angeles Police Department are taken to one of the jails located at the police department's divisional headquarters, while women are brought to either the Van Nuys

---

[5] In *People v. Vick* (1970) 11 Cal.App.3d 1058, 1067, 1071 [90 Cal.Rptr. 236], defendant was arrested at 6:05 a.m. on Wednesday and arraigned at about 9:30 a.m. on Friday. The court calculated that there was a 52-hour delay from arrest to arraignment. The court did not resolve the issue, holding that the delay in arraignment did not prejudice the defendant nor prevent him from having the opportunity for a fair trial. In *People v. Santos* (1972) 26 Cal.App.3d 397, 403 [102 Cal.Rptr. 678], defendant was arrested sometime during Saturday night, and arraigned on Wednesday morning. The issue on appeal was the admissibility of a statement made on Tuesday morning while he was in custody. "Since Saturday and Sunday are judicial holidays, the two-day period did not commence with respect to defendant until Monday and did not expire until midnight Tuesday. Since court was not then in session, defendant's arraignment Wednesday morning was entirely proper. [Citation.]" The court cited *People v. Lee, supra*, 3 Cal.App.3d 514. In *People v. Johnson* (1978) 85 Cal.App.3d 684, 688-689 [149 Cal.Rptr. 661], defendant was arrested Thursday at 7:30 a.m. and arraigned on Monday. The court stated that: "At bench the statutory two days did not expire until the end of Monday, May 23. Saturday and Sunday are excluded in calculating the time. [Citation.]" The court then went on to find that Penal Code section 825 "allows 48 hours within which to take the arrested person before the magistrate." In *People v. Mitchell* (1962) 209 Cal.App.2d 312, 320 [26 Cal.Rptr. 89], defendant was arrested at midnight between a Saturday and Sunday. He was arraigned on Tuesday. The court found no unreasonable delay. In *People v. Taylor* (1967) 250 Cal.App.2d 367, 371 [58 Cal.Rptr. 269], defendant was hospitalized until Friday and was arraigned on Tuesday. The court found no unreasonable delay. In *People v. King* (1969) 270 Cal.App.2d 817, 822-823 [76 Cal.Rptr. 145], defendant was arrested in the early morning hours of Friday, November 11, and was arraigned on Tuesday before noon. He made an oral statement to police officers on Monday at about 5 p.m. and signed a written statement Tuesday morning before being arraigned. The court found a reasonable delay "not in excess of two working days," noting that Friday, Saturday and Sunday were holidays.

[6] Appellants and respondents treated an unsigned and unfiled document appearing in the record in front of the judgment, entitled "Statement of Decision," as the statement of decision in the case. The judgment of September 8, 1983, indicates that the court "signed and caused to be filed a revised Memorandum Opinion which shall constitute this Court's Statement of Decision herein." Since the parties rely on this unsigned statement of decision, we will assume that the document they rely on correctly reflects the "revised Memorandum Opinion" referred to by the court in the judgment. Neither party on appeal disputes the accuracy of the findings of the trial court.

divisional headquarters of Los Angeles Police Department or the Sybil Brand Institute, a county facility.

Persons arrested only for misdemeanors and who have not posted bail or been released are generally taken to court on the day of their arrest or, at the latest, the next morning. Once the arrestee reaches the holding facility of the municipal court, a prosecutor in the city attorney's office reviews the police reports and decides what charges, if any, to file. The arrestee is then arraigned on the resulting misdemeanor complaint or released if no charges are filed. Respondents did not contend that this procedure results in unnecessary delays. The trial court found that there were no unnecessary delays in regard to arraignment of misdemeanor arrestees, and, accordingly, made no orders affecting misdemeanor prosecutions.

Unlike the procedure for misdemeanor arrestees, persons arrested for felony offenses are not automatically taken to court by the next morning. Instead, the case is first assigned to a detective to conduct a "follow-up investigation." About 400 officers were assigned to detective positions at the time of trial. They typically work Monday through Friday during normal working hours. Past experiments with "split shifts" (having detectives work evenings and weekends) were abandoned when they proved to be inefficient. Thus, if an arrest occurs in the daytime a detective might receive the case the same day, but arrests made at night or on the weekends are not assigned to a detective until the following weekday morning. Detectives give priority to cases in which the arrestee is in custody. Nearly half of the felony arrestees are either released on bail or released due to insufficient evidence to prosecute.

A typical follow-up investigation, which is required both by Los Angeles Police Department policy and the district attorney's case filing guidelines, includes interviewing of potential witnesses to confirm the information in the police reports and determine the witnesses' credibility and availability. Further investigation may be conducted at the crime scene, and detectives also determine the existence of an arrestee's prior criminal record. The suspect normally will be interviewed at the jail and, if the suspect chooses to speak, any statement given must be checked for accuracy and any exculpatory information investigated.

The detective prepares a written report and, with the approval of a supervisor, personally presents the case to a prosecutor in the district attorney's office. Follow-up investigations usually are completed the same day the case is assigned to a detective, who then presents the case to the prosecutor the next morning. The prosecutor may require that further follow-up investigation be conducted. Detectives sometimes wait to accumulate com-

pleted cases to avoid multiple trips to various branches of the district attorney's office.

Once any additional investigation is completed, the prosecutor either files felony charges, refers the matter to the city attorney's office for misdemeanor prosecution, or rejects the case. If a felony charge is filed, the detective arranges to have the arrestee transported to court. The Los Angeles Police Department has contracted with the Sheriff's Department to provide such transportation. The sheriff's buses make two runs; the first set of buses typically leaves the police department jails as early as 5:30 a.m. and arrives at the various courts at approximately 9 a.m. A second set of buses leaves the jails around 9 a.m. and arrives at court before noon. Even if a felony case is filed in the morning, because of this limited bus schedule, it is usually too late for transportation to take place until the next court day.

Thus, in the typical case, while a filing may be made the morning after the detective is assigned the case, the in-custody arrestee is not transported to the arraignment court until the second court day following the assignment of the case to the detective. The sheriff's bus schedules are such that an arrestee must be ready for transportation by early or midmorning in order to be transported to court.

The Los Angeles Police Department issues to each detective a document, the "due-out" schedule already mentioned above (see appen. to opn.), which was based on the advice of the city attorney's office concerning the method of calculating the "two-day" maximum period during which an arrestee must be brought before a magistrate in accordance with Penal Code section 825.

Department of Justice statistics for 1981 show that the Los Angeles Police Department made approximately 33,000 felony arrests in 1981. Approximately 15 percent were released without a complaint being sought. Approximately 35 percent of the felony arrestees were transported to the arraignment court. The approximately 84 percent of felony arrests where a complaint was sought were resolved as follows: 23 percent are rejected by all prosecuting agencies; 34 percent are filed as misdemeanors; and 27 percent are filed as felonies.

Statistics concerning one of the downtown felony arraignment courts showed that over a period of several months, 87 percent of felony arraignments took place on the "due-out date" as calculated by the Los Angeles Police Department's schedule. Four percent took place after expiration of this period, and nine percent prior to the last day of the maximum period. Arraignment courts in West Los Angeles and Van Nuys respectively

average 83 percent and 76 percent of their felony arraignments on the Los Angeles Police Department "due-out date."

 The cases interpreting both article I, section 14 of the California Constitution (which mandates that persons accused by felony complaint "be taken without unnecessary delay before a magistrate") and the provisions of Penal Code section 825 (which also mandates the taking before a magistrate "without unnecessary delay") make clear that the two-day period set forth in Penal Code section 825 is only a limitation on "necessary" delay. Thus, *no unnecessary delay* is permissible between the time of arrest and presentation to a magistrate, even if that presentation takes place within two days. Accordingly, in *People* v. *Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883], the court held: "The critical factor is the necessity for any delay in arraignment. These provisions do not authorize a two-day detention in all cases. Instead, 'a limit [is placed] upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute and of the Constitution. (See *Dragna* v. *White* (1955) 45 Cal.2d 469, 473 [289 P.2d 428]; *People* v. *Stroble* (1951) 36 Cal.2d 615, 624-626 [226 P.2d 330].)
 In determining which delays are necessary under the statute, this court has rejected arguments that the delay was 'not unusual' or made 'the work of the police and the district attorney easier.' [Citation.] As the Court of Appeal recently observed, '[t]here is no authority to delay for the purpose of investigating the case. Subject to obvious health considerations the only permissible delay between the time of arrest and bringing the accused before a magistrate is the time necessary: to complete the arrest; to book the accused; to transport the accused to court; for the district attorney to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed; and to complete the necessary clerical and administrative tasks to prepare a formal pleading. [Citations.]' (*People* v. *Williams* (1977) 68 Cal.App.3d 36, 43, fn. omitted [137 Cal.Rptr. 70].)"

With these general guidelines in mind, we turn to the contentions that the trial court erred in a number of the findings and orders referred to at the outset of this section.

*1. Follow-up Investigations*

 The court order required that in "[f]elony follow-up investigation when [the] suspect remains in custody pending filing of a complaint: A detective receiving a case involving an in-custody felony arrestee shall immediately initiate a follow-up investigation. The follow-up shall be completed no later than the first court day after arrest." Appellants argue that the court erred in making this order.

Both *People* v. *Thompson, supra,* 27 Cal.3d at page 329 and *People* v. *Williams, supra,* 68 Cal.App.3d at page 43 found that: "There is no authority to delay for the purpose of investigating the case," but do permit some delay to "evaluate" a case.

Appellants contend that the time necessary for a follow-up investigation is not an unnecessary delay.

Although several cases seem to allow investigations as "evaluation" (see below), we cannot say, in light of *Thompson* and *Williams,* that follow-up investigations do not constitute unnecessary delay. Respondents have not asked us to review the trial court's limited authorization of follow-up investigations, so that we need not address the larger issue of whether the trial court erred in permitting any arraignment delay for follow-up investigation.

The cases relied upon by appellants authorize what appears to be some follow-up investigation under the particular facts in each cases. None of them, of course, deals with the broad questions with which we are confronted.

In *People* v. *King, supra,* 270 Cal.App.2d at pages 822-823, the court found that delay was appropriate "to make certain that ground exists to support a criminal complaint," citing as an example the evaluation of a case involving multiple suspects. In *King,* the court believed that some delay was warranted as necessary to "untangling a skein of circumstantial evidence which implicated five suspects in varying degrees."

*People* v. *Haney* (1967) 249 Cal.App.2d 810, 815-816 [58 Cal.Rptr. 36], held that a detention of the accused for "a period of additional interrogation and investigation prior to his arraignment" was justified. We question the viability of this decision in light of *Thompson* and *Williams* on the question of investigations, and in light of *People* v. *Stroble, supra,* 36 Cal.2d at page 625, and *People* v. *Powell, supra,* 67 Cal.2d 32, which clearly hold that delay for interrogation is "unnecessary."

Appellants also point to three other cases to support their view that follow-up investigation is permissible delay. In *People* v. *Lee, supra,* 3 Cal.App.3d at page 522, the court found prearraignment investigative activities to be necessary under the circumstances of that case. In *Stanley* v. *Justice Court* (1976) 55 Cal.App.3d 244, 250 [127 Cal.Rptr. 532], the court stated that "brief investigation" could be proper on the ground it might exonerate the accused. And in *People* v. *Johnson, supra,* 85 Cal.App.3d at page 689, the court found that: "A delay which is occasioned by the conscientious performance of police and which is utilized for the purposes of

clerical and administrative needs and not used solely for the purpose of eliciting damaging statements from the accused is not an unreasonable delay."

It is not appropriate to conclude from these cases that "follow-up" investigative authority is warranted, especially anything beyond that designated by the trial court.

### 2. Delays in Processing and Transporting Arrestees

The court found to be "unnecessary," delays "to facilitate the accumulation of cases by detectives, so as to reduce the number of trips to prosecuting agencys' offices to allow the completion of investigations in other cases, but causing a delay of more than a few hours or to the next court day in the arraignment of an in-custody arrestee in an already completed case." The court also found "unnecessary" a delay in arraignment "to the next court day, when there remains time for arraignment on the same court day as the prosecuting agency's decision to charge is made."

To correct these practices, the court ordered that "[a]n arrestee ordinarily must be arraigned on the *same court* day that a criminal complaint is issued by the prosecuting District or City Attorney, if reasonalbe [*sic*] time is available for presenting the defendant in court before the 'cut-off' time expires for in-custody arraignments." The court also ordered that in "[f]elony follow-up investigation when suspect remains in custody pending filing of a complaint: [¶] . . . . [¶] If the District Attorney refers the complaint to the City Attorney for possible misdemeanor filing [Penal Code § 17(b)(4)], the concerned detective shall notify the Sheriff's Department to arrange bus transportation from the Criminal Courts Building to the misdemeanor arraignment courts, 429 Bauchet Street. Notification shall be made early enough to allow for the prisoner to be transported on the noon bus. If the notification to the Sheriff's Department is not made early enough for the arrestee to be placed on the noon bus to Bauchet Street, the concerned detective shall transport the arrestee. *NOTE*: This provision applies only in the central metropolitan area."

 Appellants contend that these rulings are neither required by law nor appropriate. They argue that the trial court failed to take into account the "administrative needs" of the police department reflecting "legitimate systemic necessities" which, under certain cases, authorize delay as reasonable to accomplish them. "A bus transportation plan [they argue] which awaits some degree of certainty before it moves large numbers of persons around a large geographic area such as Los Angeles cannot be deemed unreasonable as a matter of law. The occasional accumulation of cases

within the statutory maximum is similarly not unreasonable where the alternative unduly burdens already overburdened police resources in the investigation of other cases and potentially defers the release of other arrestees similarly situated." Appellants assert that individualized transportation will be necessary to meet the court's requirements, and will create an unworkable system of "perpetual motion."

These assertions greatly minimize the extent of delay found by the trial court to exist in the present system of processing and transporting of arrestees, and their argument greatly exaggerates the consequences of the court's order. For example, nothing in the trial court's findings supports appellants' claim that the practice of accumulating cases is "occasional." We conclude that the trial court correctly examined the procedures in practice by appellants, and correctly concluded that the rights of arrestees to prompt arraignment outweighed the burden placed on appellants in these areas. In our society, the "administrative needs" of the police department must yield to, and be brought into conformity with the law, not the obverse.

In *People* v. *Thompson, supra,* 27 Cal.3d at page 329, as we have already noted, the court found no authority for certain delays, and emphasized that: "The right to a prompt arraignment is ' "a fundamental right of the arrested person." ' (*People* v. *Powell* [*supra*] 67 Cal.2d [at p.] 59.)"

Appellants cite *Mills* v. *Municipal Court* (1973) 10 Cal.3d 288, 303 [110 Cal.Rptr. 329, 515 P.2d 273], as support for their argument that courts have deferred to the administrative needs of the criminal justice system, even when concerned with constitutional rights. One question under review in *Mills* was whether the requirements for waiver of constitutional rights in taking misdemeanor pleas ought to be the same as waivers in felony cases. The court allowed that collective waivers, as well as waivers through counsel, were proper in misdemeanor cases. We find nothing in *Mills* that holds that the extent of constitutionally protected rights can be modified because of the factors involved in the instant case, however, which apparently stem from financial or accommodational limits of the law enforcement budget of the second largest city in the United States.

In both *People* v. *Glover* (1974) 40 Cal.App.3d 1006, 1012 [115 Cal.Rptr. 714], and *Kaikas* v. *Superior Court* (1971) 18 Cal.App.3d 86, 90 [95 Cal.Rptr. 596],[7] it is true that the court took into account an "officer's heavy workload," to permit delays under the particular facts of those cases. That is a far cry from what the appellants propose to this court. Here we are not

---

[7] Both of these cases dealt with alleged unreasonable delay between the filing of charges and the arrest of the accused.

addressing the circumstances of a single arrestee's claim of a violation of his right to a speedy trial. In the instant case, the trial court was concerned with an overall policy affecting 33,000 felony arrestees in 1981. Appellants ask us to approve an official policy of prearraignment delays because of inadequate police resources available for prompt arraignment of arrestees. We affirm the trial court's opposite conclusion.

In regard to each matter dealt with by the trial court herein, the court's conclusions are supported by the record before it, and are compelled by the court's conclusion that the particular delay in issue was not reasonable as a matter of on-going policy. It is settled that: "Inadequate resources of finances can never be an excuse for depriving detainees of their constitutional rights. [Citations.]" (*Detainees of Brooklyn H. of Det. for Men* v. *Malcolm* (1975) 520 F.2d 392, 399; *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 920-921 [132 Cal.Rptr. 405, 553 P.2d 565].) Every one of appellants' concerns relate to a need to delay because of inadequate resources. To the extent possible, the trial court took those concerns into account.

Under appellants' contention because the city provides no transportation after noon, it becomes "necessary" for an arrestee to spend another night in jail if the filing decision is not made before noon. Appellants speculate that the court's order will result in endless buses in "perpetual motion" to deal with individualized treatment of thousands of prisoners. Nothing in the record supports these fears. Nowhere did the trial judge order individualized transportation. The trial court's orders may be inconvenient, may require more detectives, may require more deputy district attorneys, and may require more cooperative efforts between police and prosecutors. There are undoubtedly many solutions to the difficulties which the trial court's orders entail. But, appellants' proposed solution to the problems presented by the facts of this case—holding thousands of unarraigned arrestees for an extra day—is not constitutionally acceptable. No authority sanctions such massive deprivation of constitutional rights and none is warranted.

## II

### TREATMENT OF ARRESTEES IN CITY JAILS

The trial court made certain rulings concerning conditions of confinement in city jail facilities, which appellants contend were not required by law. Based on Penal Code sections 2600 and 2601, subdivisions (c) and (d), together with settled case authority, the trial court required appellants to provide city jail inmates the opportunity for brief daily visits, daily newspapers and board games, daily showers and shaves, access to sanitary materials, an opportunity to brush their teeth, habitable and

sanitary conditions in the jail, and diagnosis and treatment of mentally ill prisoners. Each of the court's rulings will be discussed below, following an initial discussion of the general rules applicable to treatment of inmates.

Penal Code section 2600 provides: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." Penal Code section 2601, subdivision (c) gives prisoners the right to receive newspapers, and subdivision (d) provides for personal visits.

In *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 872 [183 Cal.Rptr. 866, 647 P.2d 142], the Supreme Court held that pretrial county jail "detainees retain rights at least equivalent to those guaranteed state prisoners under [Pen. Code] sections 2600 and 2601," based on both equal protection grounds and a legislative intent to restore rights not only to state prison inmates, but all detainees. The court added in a footnote: "We do not imply that county jails must follow exactly the same procedures as are followed in state prisons. Whether a measure is essential to institutional security will depend upon many factors, and thus may vary from one facility to the next. We hold only that the detainees' status as inmates in a county jail instead of state prison in itself is no reason to deny them rights afforded prison inmates." (*Id.,* at p. 872, fn. 6.)

In *Bell* v. *Wolfish* (1979) 441 U.S. 520, 531-533 [60 L.Ed.2d 447, 463-465, 99 S.Ct. 1861], the United States Supreme Court confirmed that pretrial detainees are entitled to the same protection as that afforded to postconviction defendants, though concluding that the courts should generally defer to the policies adopted by prison administrators "that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.]" (*Id.,* at p. 547; fn. omitted [60 L.Ed.2d at p. 474].)

Appellants do not dispute this body of law. Excepting most of the trial court's ruling related to hygiene, appellants contend "that the trial court should have relied upon the standards for City jails established by the Board of Corrections pursuant to Penal Code §§ 6030 and 6031." Among other things, Penal Code section 6030 requires the Board of Corrections to "establish minimum standards for local detention facilities" which are to include "health and sanitary conditions, fire and life safety, security, rehabilitation programs, recreation, treatment of persons confined in local detention facilities, and personnel training." The "minimum standards" have been looked to by courts in review of local jail conditions (see *In re Gallego* (1982) 133 Cal.App.3d 75, 86 [183 Cal.Rptr. 715]), but there is no authority

to which we have been directed or which our research has disclosed that the trial court was obliged to accept these standards as a guide to the appropriateness of the conditions at Los Angeles Police Department jails. Certainly the courts may consider these guidelines, but the courts are not bound by them in determination of the scope of statutory and constitutional requirements for treatment of prisoners.

With these principles in mind, we now turn to the trial court's specific rulings on the city's treatment of inmates.

## A. *Visitation Standards*

The judgment below held that: "All prisoners shall be provided notice of and reasonable opportunities for visitation on each weekday, Saturday, Sunday and holiday, restricted as to time and duration as required by the administrative and security considerations of the jail facility and personnel, including visitation by minor children of the arrestee in the company of a responsible adult." The judgment went on to provide that access to prisoners by attorneys, bondsmen and physicians would not be limited. The court approved a plan submitted by appellants to comply with the decision, which included a limit of two visits per day of 15 minutes each between 10 a.m. to 3 p.m.

The court's statement of decision described the jail facilities operated by appellants. The jails at Parker Center and in Van Nuys "have a limited number of small visitors' rooms. At present, these visitors' rooms are used only for interviews between prisoners and attorneys, bail bondsmen, and detectives. It was apparently the theory, when the jails were designed and constructed, that the defendants would be in jail for only a very short period and that outside visitation would not be required. Accordingly, secure visitation rooms are available for only three or four inmates at a time at the larger jails." The court found that "[a]s to visitation, LAPD policy is that misdemeanor prisoners are not allowed visitors (with rare emergency exceptions) and felony prisoners are allowed visitors only with the approval of the detective in charge of the case, an approval which is rarely forthcoming. The result is that, for all practical purposes, except for bail bondsmen and attorneys, LAPD prisoners may not receive visitors. Jail division supervisory personnel justified the policy on lack of facilities for visitation and the lack of personnel to appropriately supervise visitation in a manner consonant with jail security."

Appellants argue that the Board of Corrections standards under title 15, California Code of Regulations, section 1062[8] considered visitation for prisoners in such short term facilities as "unnecessary." They reason that since the time in a city jail facility is so brief, that "each city prisoner will only be deprived of family relationships for short periods." They contend that visitation is impractical and that in jails outside Los Angeles, it is common to deny prearraignment visits, but cite the court to no authority other than title 15, and fail to point to anything in the record, to demonstrate that the trial court erred in either its findings or conclusions.

The trial court correctly concluded that Penal Code section 2601, subdivision (d) requires that the jail provide the inmate the opportunity: "To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution." Appellants' solution to the need for "reasonable security" is to eliminate visits altogether. Nothing in Penal Code section 2601, subdivision (d) contemplates that *all* visitation for *all* detainees in a given category can be eliminated. Moreover, contrary to appellants' assertion, nowhere in title 15, California Code of Regulations, section 1062 is there a provision that visits in short term facilities are not necessary. Title 15, California Code of Regulations, section 1062 simply does not deal with the matter of visitation needs for prearraignment detainees in such facilities. Were the Board of Corrections to determine that no visits are necessary in a prearraignment short term facilities, it would be contrary to Penal Code section 2601.

It is difficult to understand appellants' assertion that a short deprivation of family relations is of no significance. It is certainly based on nothing in the record, nor is it based on one's common sense of humanity or the importance of family in our culture. It should not be hard to realize that for many persons arrested, the terrible experience of incarceration is new and the break in family contact, even for a brief period, debilitating.

The trial court noted that the jail supervisors' justification for depriving arrestees of visits was "lack of facilities for visitation and the lack of personnel to appropriately supervise visitation." We have already pointed out that: "Inadequate resources of finances can never be an excuse for depriving detainees of their constitutional rights. [Citations.]" (*Detainees of Brooklyn*

---

[8] Title 15, California Code of Regulations, section 1062 provides: "The facility administrator or the facility manager shall develop and implement an inmate visiting plan. Such plan shall provide for as many visits and visitors as facility schedules, space, and number of personnel will allow. For sentenced inmates in Type I facilities and all inmates in Type II facilities there shall be allowed no fewer than two visits totaling at least one hour per inmate each week." A Type I facility "means a local detention facility used for the detention of persons usually pending arraignment for not more than 48 hours excluding holidays and weekends after booking." (Cal. Code Regs., tit. 15, § 1006, subd. (b)(3).)

*H. of Det. for Men* v. *Malcolm, supra,* 520 F.2d at p. 399, and see *Payne* v. *Superior Court, supra,* 17 Cal.3d at pp. 920-921.)

The trial court's rulings in regard to visitation are balanced and reasonable, and adequately take into account the legitimate needs of the appellants.

### B. *Reading and Recreational Standards*

The judgment of the trial court directed appellants to provide all prisoners "reasonable access to appropriate reading matter, and to appropriate recreational opportunities, restricted as to type and time by the administrative and security considerations of the jail facility and personnel." The court ordered appellants to "provide daily newspapers in general circulation in the City of Los Angeles, including a Spanish language publication. A sufficient number of newspapers will be provided to ensure reasonable access by interested prisoners. [¶] The Department will provide checkers, checkerboards, and dominoes, in sufficient quantities to ensure access to such games by interested prisoners. [¶] Every prisoner shall have access to such reading and recreational materials between 1000 and 2130 hours, daily."

The court, in its decision, found that "[a]side from telephones, no recreation, reading, or other amenities are provided in any of the LAPD jails. There are no libraries, mobile or otherwise, there are no newspaper racks, . . ." The only exception to this state of affairs is the existence of candy machines at the Parker Center jail, located outside the cells, which the detainees can use by pooling money one or more times a day, and sending one of their number out of the cell to make purchases. The court found that all the jails are operated by a "paucity of jail personnel." Furthermore, all reading matter is "entirely prohibited" at city jails, and none is allowed to be sent in from the outside, nor are inmates even allowed to retain reading matter in their possession when booked. Jail personnel explained the ban on reading matter on the ground that "toilets were frequently clogged by prisoners with various materials available."

Toilet clogging is a significant problem in the jail. The court found that clogging takes place without reading materials. Indeed, almost any object can and is used for that purpose. The court found that while clogged toilets are a problem, "the testimony did not indicate that the availability of reading matter would increase the problem over and above what it is now."

The trial court also found that no recreational opportunities of any sort are provided at city jail, this includes indoor or outdoor recreation, televi-

sion, radio and "[t]here are no games or cards, and prisoners have no way to pass the time but wait until the time comes for them to go to court or be released."

In the face of the trial court's very modest order for newspapers and limited recreation (cards and table games), appellants ask us to find some error, citing title 15, California Code of Regulations, sections 1065-1066, which they claim provides that the Board of Corrections determined that these amenities are not required. We have examined the two sections. It is true that they make no provisions for recreation or reading matter in type I facilities. It is, however, a distortion for appellants to interpret this lack as a "determination" on the subject. Appellants can point to no legitimate governmental interest served by the total ban on reading and recreational materials. Such an unsupported ban is unconstitutional. (See *Procunier* v. *Martinez* (1974) 416 U.S. 396, 407-409 [40 L.Ed.2d 224, 236-238, 94 S.Ct. 1800]; *Daniels* v. *McKinney* (1983) 146 Cal.App.3d 42, 47-48 [193 Cal.Rptr. 842].) As noted in the trial court's opinion, "[t]he court finds that the total denial of all recreational activities is not required by the 'legitimate governmental interest' rational applicable to the LAPD jails under the *Bell* [*Bell* v. *Wolfish, supra,* 441 U.S. 520] case."

### C. *Sanitation and Hygiene Standards*

The trial court, in its judgment, required that "[p]risoners shall be provided reasonably habitable and sanitary conditions in all booking, holding and housing areas and shall be afforded reasonable opportunities and facilities to shower and shave," with appropriate security limitations. A plan was appended to the judgment on this matter. In essence, the plan provided for hygienic supplies for men and women, and the opportunity for a shower, shave and tooth brushing to an arrestee in custody longer than the morning following arrest.

Judge Hupp's factual findings indicated that there are limited shower and sink facilities at city jails. The court found that "misdemeanor prisoners are normally not given the opportunity to shower or shave. The exception occurs when a misdemeanor prisoner on arrest is exceptionally dirty. Felony prisoners are normally given the opportunity to take a shower shortly after booking, but thereafter have no opportunity to shower or shave. . . . The lack of opportunity to shower was plainly evident on a view of the Parker Center jail; one of the two shower rooms containing three showers was apparently used for the storage of towels and other linens and the jailer did not know how to turn showers on without considerable fumbling with the controls. It is apparent to the court that even the existing shower

facilities are not used to capacity and that the reason is the lack of jailers to supervise the operation."

Appellants' concede that the "privileges" of a shave and a shower ought to be made available, citing title 15, California Code of Regulations, section 1266, but argue that on return to the trial court they will ask the court to implement title 15, California Code of Regulations, section 1266 which requires showering "at least every other day or more often if possible." It is apparent that even were this section binding on the trial court, the order given herein is certainly in conformity with such a standard. The standard referred to by appellants recognizes that the "every other day" rule is the *least* that should be done. We also note that showering is not the only issue encompassed in the court order. In light of appellants' concession, no further comment is needed.

## D. *Mental Health Standards*

The judgment of the trial court provides that arrestees "shall be afforded reasonably prompt diagnostic screening by appropriately trained medical personnel whenever said prisoner's behavior may be indicative of acute psychoses [*sic*] or other severe mental illness, followed where medically indicated by either suitable intervention and treatment by medically trained personnel or transfer to other appropriate facilities for such treatment." The details of implementing this order were left by the court to further proceedings which resulted in a supplemental judgment filed February 17, 1984. This supplement contained a detailed order for the "Identification and Custodial Disposition of Mentally Ill Arrestees." Since it appears that appellants' argue that the court should have made no order on this subject, there is no need to discuss the details of the supplemental judgment.

The court's decision dealt in great detail with the mentally ill in city jails. Jail personnel, including medical personnel assigned to the jails, have inadequate psychiatric experience to distinguish between arrestees enraged at their plight, inmates undergoing drug reactions, and those who are psychotic or mentally ill. The court required appellants to develop a plan "to attempt diagnosis of those prisoners whose behavior indicates psychotic reactions from mental illness and thereafter a plan to treat those so diagnosed in recognized ways." The court found that violent prisoners who may be suffering from mental illness, "receive no treatment at the LAPD jails." Doctors assigned to the jail care only for physical medical problems and not psychiatric problems. The court found that "[d]ealing with violent or suicidal inmates is a significant problem for the jail. The jail receives a significant number of inmates with either psychiatric problems or drug-in-

duced psychotic states. Violent prisoners under the influence of PCP are frequent. The jailers place such prisoners in padded cells until the drug-induced psychosis has dissipated to the point where the prisoner can be returned to the main jail population."

In the face of substantial clear authority to the contrary, appellants insist that the court's orders were unwarranted. They seem to believe that the court's judgment requires treatment where not "medically necessary." The trial court's order simply requires that "[e]very arrestee whose behavior indicates the possibility of severe mental illness shall be afforded reasonably prompt diagnostic screening by appropriately trained medical personnel, followed where *medically indicated* by either suitable intervention and treatment by medically trained personnel or transfer to other appropriate facilities for such treatment." (Italics added.)

The trial court correctly and appropriately followed the law in this regard. In *Estelle* v. *Gamble* (1976) 429 U.S. 97, 104-105 [50 L.Ed.2d 251, 260, 97 S.Ct. 285], the United States Supreme Court held: "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' [citation] proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." (Fns. omitted.) The court decision below does not impose a requirement for care of the mentally ill without "medical" necessity. Of course, "medical" in this context encompasses both physical and mental health. The trial court's order properly follows the criteria for treatment set out in *Bowring* v. *Godwin* (1977) 551 F.2d 44, 47. That case holds that an inmate "is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." Appellants have directed this court to nothing in the supplemental judgment inconsistent with the law.

The judgment is affirmed.

McClosky, J., concurred.

GEORGE, J.—I dissent. With all due deference to the detailed findings and carefully drawn conclusions rendered by the learned trial court, I must

respectfully voice my disagreement with its restrictive interpretation of Penal Code section 825 and its invalidation of certain policies of the Los Angeles Police Department (LAPD) pertaining to arrestees confined in city jail facilities. I submit that some of the rules promulgated by the majority opinion in upholding the judgment rendered by the trial court are unsupported by constitutional, statutory, or case law and will impose an onerous burden upon LAPD.[1] Without such support in the law, this court is without authority to mandate what procedures are to be used by LAPD in processing, transporting, and housing the many thousands of felony arrestees taken into custody each year by that agency.

I

APPLICATION OF THE REQUIREMENT IN PENAL CODE SECTION 825 THAT AN ARRESTEE BE TAKEN BEFORE A MAGISTRATE WITHOUT UNNECESSARY DELAY AND, IN ANY EVENT, WITHIN TWO DAYS AFTER ARREST

Establishing the constitutional right to speedy trial during the time preceding a suspect's initial court appearance, article I, section 14 of the California Constitution requires that "A person charged with a felony by complaint . . . shall be taken without unnecessary delay before a magistrate . . . ." (See also Pen. Code, § 849, subd. (a).) Section 825[2] enforces this mandate by providing: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following." Section 825 thus commands that a felony arrestee be brought to court as soon as reasonably possible but, in any event, that the initial court appearance take place within a maximum two-day period as defined by the statute.

### A. Defining the "Two-day" Maximum Period

The record before the trial court indicates that during the year 1981, the focus of the parties' evidence, LAPD made approximately 33,000 felony arrests, resulting in the transportation of nearly 12,000 prisoners to court and the filing of approximately 8,900 felony complaints.

---

[1] The record reflects that the judgment rendered by the trial court is to take effect only upon finality of this appeal.

[2] All statutory references are to the Penal Code unless otherwise indicated.

The trial court found that LAPD issues to each detective a document entitled arrestee release schedule, commonly referred to as the due-out schedule, which is based on the advice of the Los Angeles City Attorney's Office concerning the method of calculating the "two-day" maximum period under section 825. According to the schedule, the first step of this calculation is to count 48 hours from the time of arrest, excluding weekends and holidays. (The statute expressly excludes Sundays and holidays from the calculation of the two days, and Saturdays are municipal court holidays. Gov. Code, § 71345; *People* v. *Ross* (1965) 236 Cal.App.2d 364, 368 [46 Cal.Rptr. 41].) When the end of this 48-hour period falls at a time when court is normally not in session (the schedule assumes normal court hours to be from 9 a.m. to 4 p.m.), the schedule adds the duration of the next court session to the maximum two-day period.

Statistics covering one of the downtown felony arraignment courts revealed that over a period of several months, 87 percent of the felony arraignments took place on the "due-out date" as calculated by the LAPD arrestee release schedule; 4 percent took place after expiration of this period, and 9 percent prior to the last day of the maximum period. The rate of arraignments transpiring prior to the LAPD "due-out date" was several percentage points higher in some of the branch courts.

The majority opinion, like the court below, holds that LAPD's interpretation of the maximum period specified in section 825 is erroneous. Considering itself bound by statements in *People* v. *Powell* (1967) 67 Cal.2d 32, 59 [429 P.2d 137], and *People* v. *Hall* (1964) 62 Cal.2d 104, 108, footnote 6 [41 Cal.Rptr. 284, 396 P.2d 700], while apparently recognizing that the language in question is dictum, the majority chooses not to follow several later decisions of the Courts of Appeal, *infra,* which approve LAPD's 48-hour method of calculating the two-day maximum period. Instead, the majority affirms the trial court's holding that the "correct rule is that a defendant arrested *at any time* on one day must be arraigned on the second court day thereafter." (Italics added.) Thus, for example, a suspect arrested at 11 p.m. on Monday must, under the rule adopted by the majority, be arraigned no later than the close of court business on Wednesday.

The record indicates that during the relatively short period between arrest and arraignment, the case must be assigned to a detective for "follow-up investigation," which is required both by LAPD policy and the Los Angeles District Attorney's case-filing guidelines and involves the following: potential witnesses are interviewed to confirm the information in the police reports and determine the witnesses' credibility and availability; further investigation may be conducted at the crime scene, sometimes resulting in the need for laboratory analysis; the existence and extent of any prior

criminal record of the arrestee is determined; he or she is interviewed at the jail, and any statement is checked for accuracy and any exculpatory information investigated. The detective prepares a written report and, after obtaining approval from a supervisor, personally presents the case to a prosecutor in the district attorney's office, who may require further follow-up investigation. Detectives give priority to cases in which the suspect is in custody but sometimes wait to accumulate completed cases in order to avoid time-consuming multiple trips to various branches of the district attorney's office. The trial court found that the detectives "have heavy workloads" and "cannot accomplish the tasks required of them without all detectives operating consistently at a high level of efficiency." LAPD has reluctantly found it necessary to authorize substantial overtime for follow-up investigation work.

Once any additional investigation is completed, the prosecutor either files felony charges, refers the matter to the city attorney's office for misdemeanor prosecution, or rejects the case. If a felony charge is filed, the detective arranges to have the arrestee transported to court. LAPD has contracted with the sheriff's department to provide such transportation. The sheriff's buses make two runs; the first set of buses typically leaves the police department jails as early as 5:30 a.m., arriving at the various courts at approximately 9 a.m. A second set of buses leaves the jails around 9 a.m., arriving at court before noon. Therefore, even if a felony case is filed in the morning, it is usually too late for the scheduled transportation to take place until the next day.

"In construing a statute . . . the court 'turns first to the words themselves for the answer.' [Citations.]" (*Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].) However, the language of section 825 is ambiguous on the point in question. The statute states that an arrestee must be brought to court "within two days." Although this could suggest that a period of two calendar days was intended, section 825 was amended in 1961 to provide for an extension of this period if "the two days prescribed herein expire at a time" when court is not in session. Use of the phrase "at a time" rather than "on a day" suggests that the Legislature was speaking in terms of hours and envisioned a 48-hour period beginning at the time of arrest. Unlike the majority, which "find[s] no ambiguity or uncertainty" on the face of section 825 (majority opn., *ante,* p. 1314), I find the statutory phrase uncertain and the concept of "time" inherently ambiguous. "The word is expressive both of a precise *point* or *terminus* and of an *interval* between two points." (Black's Law Dict. (5th ed. 1979) p. 1329, col. 2, italics in original.) Resort to the legislative history of the statute is thus appropriate in attempting to harmonize and make sense of its various

provisions. (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744].)

Section 825, as originally worded, stated merely that "The defendant must in all cases be taken before the magistrate without unnecessary delay."[3] In 1927, section 825 was amended to read, in pertinent part, "The defendant must in all cases be taken before the magistrate without unnecessary delay and, in any event, within two days after his arrest, excluding Sundays and holidays . . . ." (Stats. 1927, ch. 616, § 1, p. 1044.) In 1955, in his opinion for the court in *Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 9 [291 P.2d 929], then-Justice Traynor addressed the two-day provision which had been added to section 825 and, for no apparent reason other than literary prerogative, referred to it as "the 48-hour period" following the arrest. The Courts of Appeal adopted this practice and, in a series of decisions between 1957 and 1960, described the two-day provision in section 825 as "48 hours." (*People* v. *Soto* (1957) 155 Cal.App.2d 344, 346 [317

---

[3] When it was initially enacted, section 825 was intended to apply only to arrests pursuant to warrants. Both the original version of section 825, enacted in 1871, and its predecessor, section 119 of the Criminal Practice Act, enacted 20 years earlier, were placed in a chapter entitled The Warrant of Arrest, a circumstance to be considered in ascertaining the legislative purpose. (*American Federation of Teachers* v. *Board of Education* (1980) 107 Cal.App.3d 829, 836 [166 Cal.Rptr. 89].) This chapter included section 813 which established, as does its current version, the grounds for issuing an arrest warrant. Section 821, both as originally enacted and in its present version, directs that when an arrest is made, the defendant must be taken before the magistrate who issued the warrant or another magistrate in the same county. Section 825, in its original form, added simply that "The defendant must in all cases be taken before the magistrate without unnecessary delay . . . ." The immediately succeeding provision in the 1872 Code, section 826, specified the procedure if the defendant was taken before a different magistrate from the one who issued the warrant.

An arrest made without a warrant was covered by section 849, enacted in 1872 and placed in another chapter entitled Arrest, By Whom and How Made. Section 849 provided that the accused was to be taken before the nearest magistrate without unnecessary delay and an accusatory pleading "stating the charge against the arrested person, shall be laid before such magistrate." Although section 849, like section 825, mandates that the initial court appearance take place "without unnecessary delay," section 849 contains no "two-day" maximum.

This once-clear distinction between section 825, regarding arrests pursuant to warrant, and section 849, controlling warrantless arrests, became blurred over the years. Recently (in 1981) section 824, which expressly deals only with arrests made *without* a warrant, was added to the chapter entitled The Warrant of Arrest. Furthermore, court decisions consistently have treated section 825 as if it applied to all arrests, with or without a warrant. (See, e.g., *People* v. *Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883];*Dragna* v. *White* (1955) 45 Cal.2d 469, 472-473 [289 P.2d 428]; Barrett, *Police Practices and the Law— From Arrest to Release or Charge* (1962) 50 Cal.L.Rev. 11, 30, fn. 79; but see, *People* v. *Pettingill* (1978) 21 Cal.3d 231, 243 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Williams* (1977) 68 Cal.App.3d 36, 42, fn. 1 [137 Cal.Rptr. 70]; *Stanley* v. *Justice Court* (1976) 55 Cal.App.3d 244, 250-251 [127 Cal.Rptr. 532].) Accordingly, given the foregoing lengthy history of judicial interpretation, restoration of the originally-intended limited applicability of section 825 to arrests made pursuant to warrant is perhaps beyond judicial reach at this late date, and it may be necessary to assume that section 825 applies to all arrests whether made with or without a warrant.

P.2d 1005]; *People* v. *Speaks* (1957) 156 Cal.App.2d 25, 37 [319 P.2d 709]; *People* v. *Schindler* (1960) 179 Cal.App.2d 584, 589 [3 Cal.Rptr. 865]; *People* v. *Hall* (1960) 186 Cal.App.2d 388, 394 [8 Cal.Rptr. 760].) During this period the California Supreme Court again used the phrase "48 hours" in referring to the time period set forth in this statute. (*People* v. *Jackson* (1959) 53 Cal.2d 89, 94 [346 P.2d 389]; *People* v. *Lane* (1961) 56 Cal.2d 773, 780 [16 Cal.Rptr. 801, 366 P.2d 57]. See also *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 431 [166 Cal.Rptr. 149, 613 P.2d 210].)

The Legislature amended section 825 in 1961, adding the following language to the requirement that the defendant be taken before a magistrate within two days: "provided, however, that when the two days prescribed herein expire at a *time* when the court in which the magistrate is sitting is not in session, such *time* shall be extended to include the duration of the next regular court session on the judicial day immediately following." (Stats. 1961, ch. 2209, § 1, p. 4554, italics added.)

Three years later, the California Supreme Court made a brief reference to section 825 in *People* v. *Hall, supra,* 62 Cal.2d 104, in which a conviction for murder was overturned on the sole ground that the evidence was insufficient to support the judgment. (*Id.,* at p. 109.) The recitation of facts in the opinion reflects that the defendant was arrested at 9:30 p.m. on a Saturday and was arraigned the following Wednesday. In a footnote, the court observed that "By failing to take defendant before a magistrate 'within two days after his arrest, excluding Sundays and holidays' (Pen. Code, § 825), the officers exceeded the maximum period during which a defendant may be lawfully detained." (*Id.,* at p. 108, fn. 6.) No reference was made, however, to the language added by the 1961 amendment.[4] The footnote went on to note that although the defendant had been interrogated during this detention, "California law, however, does not require the exclusion of evidence as a consequence of such a violation." (*Ibid.*) These two sentences comprise the entire discussion of the arraignment in *Hall* and certainly do not constitute a holding.

In 1965, the Court of Appeal in *People* v. *Ross, supra,* 236 Cal.App.2d 364, was faced with the issue whether an arrestee had been illegally detained beyond the maximum period allowed by section 825. In that case, the two-day maximum period was calculated by counting 48 hours from the date and time of arrest. (*Id.,* at p. 368.) This procedure was adopted without discussion, and the possibility that section 825 might refer to two calendar days rather than 48 hours as suggested in the earlier opinion in *Hall* was not acknowledged, nor was any reference made to that case.

---

[4] The arrest in *Hall* was made on May 19, 1962, after the effective date of the amendment.

Two years later, this issue again came to the attention of the California Supreme Court in *People v. Powell, supra,* 67 Cal.2d 32. The murder convictions of the codefendants in *Powell* were reversed because the police had obtained incriminating statements without warning the defendants of their constitutional rights as required by the decisions in *Escobedo v. Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People v. Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], which were decided after the trial in that case had been completed. Although the *Escobedo-Dorado* issue was dispositive of the appeal, the court went on to discuss the delay in arraignment, noting that "the police and prosecuting authorities are not blameless even under the law as it stood at the time of the investigation and trial." (*Id.,* at p. 58.) The codefendants had been arrested on a Sunday and arraigned the following Wednesday. Without considering the language added by the 1961 amendment,[5] the court stated that this detention was "patently illegal" under the two-day maximum period established by section 825 and observed that there was "unnecessary delay" within the meaning of the statute because the intent of the police was to conduct repeated interrogations of the defendants. (*Id.,* at pp. 59-61.) No citation was made to the footnote in *Hall,* or to the contrary analysis in *People v. Ross, supra,* 236 Cal.App.2d at page 368, or to the numerous references by the Supreme Court and the Courts of Appeal to the statutory provision as a "48-hour" rule. The *Powell* decision did not reach a holding as to the meaning of the "two-day" provision and instead concluded the discussion with the following statement: "As the judgment must be reversed because of violation of the *Escobedo-Dorado* rules, we need not decide at this time whether the circumstances just described amounted to such prejudice as to render reversible the denial of defendants' constitutional and statutory rights to prompt arraignment. But we cannot condone such conduct by the police, and any repetition thereof will be closely scrutinized." (*Id.,* at p. 61.)

The next case to address this issue, *People v. Chambers* (1969) 276 Cal.App.2d 89 [80 Cal.Rptr. 672], used the same method of calculation as *People v. Ross, supra,* 236 Cal.App.2d at page 368, counting a 48-hour period beginning at the date and time of arrest. Again, this conclusion was not supported by any analysis of section 825, and the previous decisions in *Hall, Ross* and *Powell* were not cited.

In *People v. Lee* (1970) 3 Cal.App.3d 514, 521 [83 Cal.Rptr. 715], the opinions in *Chambers* and *Ross* were cited as controlling authority, and the 48-hour method of calculating the maximum period in section 825 was again utilized. Other than the citation to the authority of *Chambers* and

---

[5] The arrests in *Powell* occurred on March 10, 1963, after the effective date of the amendment.

*Ross,* however, the decision in *Lee* contained no analysis of this issue. Surprisingly, the opinion in *Lee* cited both *Powell* and *Hall* in discussing a related issue, without acknowledging the contrary interpretation of the two-day provision of section 825 found in those opinions. (*People v. Lee, supra,* 3 Cal.App.3d at pp. 521-523.) The court that decided *People v. Lee* came to an identical decision in *People v. Vick* (1970) 11 Cal.App.3d 1058, 1067 [90 Cal.Rptr. 236]. Finally, the court in *People v. Santos* (1972) 26 Cal.App.3d 397, 403 [102 Cal.Rptr. 678], followed the holding in *People v. Lee, supra,* on identical facts without any independent analysis of the issue. There appears to be no decision of the Courts of Appeal which discusses those portions of *Powell* and *Hall* relating to the two-day provision of section 825. In denying petitions for hearing in the *Ross, Chambers, Lee,* and *Vick* cases, the Supreme Court failed to avail itself of the opportunity to clarify this issue.

Although the California Supreme Court has twice spoken on this issue in *Powell* and *Hall,* I disagree with the trial court's conclusion that these decisions constitute binding precedent on this question. Of course under the doctrine of stare decisis both the trial court and this tribunal are bound to follow decisions of the California Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) But it is equally well-established that "The doctrine of stare decisis applies only to judicial precedents, i.e., to the ratio decidendi or actual ground of decision of a case cited as authority." (*Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].) "Incidental statements or conclusions not necessary to the decision are not to be regarded as authority." (*Simmons* v. *Superior Court* (1959) 52 Cal.2d 373, 378 [341 P.2d 13].) The reason for this rule was explained by Chief Justice Marshall in *Cohens* v. *Virginia* (1821) 19 U.S. 264, 399 [5 L.Ed. 257, 290]: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

This does not mean that expressions of the Supreme Court not necessary to the decisions in which they appear may simply be ignored. "[I]t does not follow that the *dictum* of a court is always and at all times to be discarded. A correct principle of law may be announced in a given case, although it may not be necessary to there apply it, because of other principles upon

which the case then under consideration may be disposed of." (*San Joaquin etc. Irr. Co.* v. *Stanislaus* (1908) 155 Cal. 21, 28 [99 P. 365], italics in original.) Such dictum, while not controlling authority, carries persuasive weight and should be followed where it reflects a thorough analysis of the issue or reflects compelling logic. (*United Steelworkers of America* v. *Board of Education* (1984) 162 Cal.App.3d 823, 835 [209 Cal.Rptr. 16]; *Graydon* v. *Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 643 [164 Cal.Rptr. 56]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 785, p. 756.)

The discussions in *Powell* and *Hall* concerning section 825 are not necessary to those decisions and thus constitute dictum, just as does the Supreme Court's contrary characterization of this statute in 1980 as providing a period of "48 hours." (*Van Atta* v. *Scott, supra,* 27 Cal.3d at p. 431.) The dictum in these opinions carries little persuasive weight since the issue is not thoroughly discussed. The most obvious defect in the discussions in *Powell* and *Hall* is that the court considered only the first portion of section 825 which states, "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . . ." The court did not discuss the crucial additional language, added in 1961, which states that "when the two days prescribed herein expire at a *time* when the court in which the magistrate is sitting is not in session, such *time* shall be extended to include the duration of the next regular court session on the judicial day immediately following." (Italics added.) Having failed to consider the impact of the entire statute, the foregoing discussions by the Supreme Court are of little assistance in deciding the issue now before us.[6]

Justice Leonard Friedman as author of the Third District's opinions in *Ng* v. *State Personnel Bd.* (1977) 68 Cal.App.3d 600, 606-607 [137 Cal.Rptr. 387], and *People* v. *Gregg* (1970) 5 Cal.App.3d 502, 506-507 [85 Cal.Rptr. 273], declined to follow California Supreme Court dictum. In *Ng,* the Court of Appeal observed with reference to a recent Supreme Court opinion's discussion of a *statute*: "The quoted sentence is dictum, entitled to respect but not binding. [Citation.] The sentence is an elliptical but inaccurate rendition of *part* of Government Code section 19630. . . . [¶] . . . Were the Supreme Court squarely faced with the question, the court would

---

[6]The majority's reliance on *People* v. *Pettingill, supra,* 21 Cal.3d 231, 243-244, is misplaced. The entire focus of the discussion in *Pettingill* is on the "unnecessary delay" aspect of section 825. Although the court in *Pettingill* does make reference to the maximum "two-day detention" authorized by section 825 in its discussion of the *Powell* case, it also quotes a passage from *Powell* that cites *Rogers* v. *Superior Court, supra,* 46 Cal.2d 3, 10, a case in which the period is described as "48 hours." No attempt to define the nature of the two-day period is made in *Pettingill.*

doubtless follow the statute rather than its dictum." (68 Cal.App.3d at pp. 606-607, italics added.) In *Gregg,* the Court of Appeal stated: "The *per curiam* [Supreme Court] opinion did not clothe the statement with reasoning or discussion. In its support the opinion cited no case law . . . . [¶] . . . . [¶] We distinguish between *ratio decidendi* and dictum, because the brief statement . . . cites only secondary authority and, in light of primary authority, represents an erroneous interpretation of the law." (*People* v. *Gregg, supra,* at pp. 506-507.)

I agree with the majority that previous decisions of the Courts of Appeal are also not persuasive because they lack any analysis of the issue. No reasons are given in those opinions for adopting the 48-hour method of calculation, and the alternative possibility of construing the statute to refer to two calendar days as suggested in *Powell* and *Hall* is not acknowledged. Since this court is therefore not bound by any prior judicial decisions interpreting the two-day provision of section 825, the statute itself must be examined with particular emphasis on the language added by the 1961 amendment.

In construing the intent of the Legislature in enacting this amendment to section 825, this court must be guided by familiar rules of statutory interpretation. "We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.] 'If possible, *significance should be given to every word, phrase, sentence and part of an act* in pursuance of the legislative purpose' [citation]; '*a construction making some words surplusage is to be avoided.*' [Citation.]" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224], italics added.) Furthermore, "the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' [Citations.]" (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288].)

As noted by the majority (*ante,* p. 1314, fn. 3), we previously granted appellants' motion "that the Court take judicial notice of the legislative history of the Penal Code § 825, particularly respecting 1961 amendments to that statute (Stats. 1961, ch. 2209), pursuant to California Evidence Code § 459, subd. (a)." The trial court did not have the benefit of this legislative history. "The interpretation of a statute, however, is a question of law, and we are not bound by evidence presented on the question in the trial court."

(*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; see also Evid. Code, § 459, subd. (a).)

"General background materials pertaining to this 1961 legislation" amending section 825 were furnished by the Legislative Intent Service (see *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 219 [185 Cal.Rptr. 270, 649 P.2d 912]) and included the transcript of a public hearing of the Assembly Interim Committee on Criminal Procedure conducted on February 18 and 19, 1960, pertaining to "Laws of Arrest."[7] Such documents are the type of material this division has readily consulted in the past. (*F & P Growers Assn.* v. *Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667, 678 [214 Cal.Rptr. 355]; *Post* v. *Prati* (1979) 90 Cal.App.3d 626, 634 [153 Cal.Rptr. 511].) Contrary to the opinion of the majority (*ante,* p. 1314, fn. 4), there is ample precedent and justification for considering interim hearings as part of a statute's legislative history (*Flesher* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 322, 325 [152 Cal.Rptr. 459, 590 P.2d 35]), even hearings conducted prior to the introduction of the specific bill that led to the statutory enactment in question. (*Seibert* v. *Sears, Roebuck & Co.* (1975) 45 Cal.App.3d 1, 17, 20 [120 Cal.Rptr. 233].)

As appellants correctly note, the trial court's interpretation of section 825, requiring that an arrestee be brought to court on the second judicial day following his or her arrest regardless of the time of day the arrest was made, would render the 1961 amendment a nullity. The language added to the statute in 1927 already provided that Sundays and holidays were to be excluded from the two-day period within which an arrestee must be taken before a magistrate following the arrest. The addition in 1961 of the qualifying language which begins "provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session," obviously was intended to extend this period under certain circumstances. It appears that in using the phrase "when the two days prescribed herein expire at a *time*" (rather than "on a *day*") "when the court . . . is not in session," the Legislature understood that the two-day period subject to extension was a 48-hour period rather than two calendar days; under the above-quoted rules of statutory construction, we must deem the Legislature to have been aware of the frequent judicial references to the two-day provision of section 825 as a 48-hour period.

---

[7] The Assembly Committee on Criminal Procedure on June 13, 1961, reported favorably on Senate Bill No. 550, recommending that the bill be amended. As amended, the bill was passed by the Assembly; the Senate concurred in the Assembly amendment, and upon approval by the Governor the bill was chaptered as chapter 2209, amending section 825 effective September 15, 1961.

In interpreting section 825, one need not rely only on the presumption that the Legislature was aware of judicial decisions construing the statute. (*People* v. *Overstreet, supra,* 42 Cal.3d at p. 897.) The aforementioned transcript of the hearing of the Assembly Interim Committee on Criminal Procedure reflects repeated references (at pp. 4-7) to the two-day proviso under section 825 as a "48-hour" period, including two such references by the Chairman of the Committee, Assemblyman John A. O'Connell. Additionally, the transcript of that hearing reflects several references (at pp. 5, 7), one by the committee chairman, to an opinion in which this court discussed a defendant's claim "that failure to take him before a magistrate within 48 hours constituted a denial of due process" (*People* v. *Grace* (1958) 166 Cal.App.2d 68, 78 [332 P.2d 811]), as well as a reference to the opinion in *Rogers* v. *Superior Court, supra,* 46 Cal.2d 3, in which then-Justice Traynor stated for the Supreme Court that under section 825, "Detention beyond the 48-hour statutory maximum without being taken before a magistrate is unquestionably illegal. [Fn. omitted.]" (*Id.,* at p. 9.)[8]

The majority takes the position that under its interpretation of the statute, the 1961 amendment to section 825 would not be rendered a nullity and the language extending the time "when the two days prescribed herein expire at a time when the court . . . is not in session" (§ 825) need not be viewed as surplusage, because "a magistrate in a district which has only one judge or justice, or magistrate 'on call' under Penal Code section 810, might be unexpectedly ill, or absent for some reason." (Majority opn., *ante,* p. 1314.) The fallacy of this argument is apparent from the following circumstances: (1) section 810 was enacted in 1973, 12 years after the 1961 amendment to section 825; (2) section 849 provides that in the case of a person arrested without a warrant, he or she "shall, without unnecessary delay, be taken before the *nearest or most accessible magistrate in the county* . . . ." (italics added; see also § 821); therefore, since all judges of all courts

---

[8] "CHAIRMAN O'CONNELL: May I ask—there have been a couple of cases that came out of Los Angeles, *Strain* and *Grace,* where the arrestee was held much longer than *the forty-eight hours before being arraigned,* and I think that [Justice] Vallee criticized the—

"MR. BURNS [Assistant City Attorney of Los Angeles]: Judge Vallee didn't count his holidays in one of those cases. He was wrong, but it was too late after he had made the decision—

"CHAIRMAN O'CONNELL: My point was that there have been examples of cases where people were *not brought before a magistrate in forty-eight hours* and I wonder just how often this happens, is there any special reason for it or has there been a change in practice since those cases so that it now never happens. Just what is the answer?

"MR. BURNS: No, it's happened quite regularly up to, you might say, the *People* vs. *Grace.* That was, *Rogers* vs. *Superior Court* plus *Dragna* vs. *White* and the *Grace* Case. They were the three cases that finally focussed [*sic*] the problem. It's a problem created by judicial decision - *825,* relating to arrests under warrants, *Penal Code Section* 825 is in the Chapter, Arrests Under Warrant, a warrant arrest. . . ." (Assem. Interim Com. Rep. (1960) Crim. Procedure, Laws of Arrest, p. 5, italics added.)

in the county are defined as magistrates (§ 808), the absence of a magistrate in a one-judge district should not be assumed to have concerned the Legislature; and (3) not only does the legislative history behind the enactment of the 1961 amendment fail to support the majority's speculative hypothesis, but on the contrary the testimony and discussion at the aforementioned hearing pertaining to section 825 were concerned almost exclusively with the problem of arraignments in large metropolitan areas and the expiration of the 48-hour period at a time outside regular court hours.

The majority also asserts that the Legislature's failure to substitute the term "48 hours" for "two days" when it amended section 825 in 1961 reflected legislative recognition that the maximum period of detention, excluding weekends and holidays, comprised two calendar days. (Majority opn., *ante,* p. 1310.) However, a more reasonable explanation for the legislative choice of phrase in reiterating a "two-day" period is that the Legislature, as already demonstrated, was aware that the statute had been interpreted by courts and law enforcement agencies as providing a 48-hour maximum period of detention prior to the initial court appearance unless extended over a weekend or holiday. The Legislature, had it desired to do so, could have provided for an extension when the two-day period expires "on a *day*" when the court is not in session instead of referring as it did to expiration "at a *time*" when court is not in session.

The majority observes that "the Legislature has used the term '48 hours' rather than 'two days' when it wished to do so," citing section 824. (Majority opn., *ante,* p. 1310.) That statute, enacted in 1981, provides: "When an adult willfully misrepresents himself or herself to be a minor under 18 years of age when taken into custody and this misrepresentation effects a material delay in investigation which prevents the filing of a criminal complaint against him or her in a court of competent jurisdiction within 48 hours, the complaint shall be filed within 48 hours from the time the true age is determined, excluding nonjudicial days."

The legislative history behind the enactment of section 824, far from supporting the majority's view, actually provides yet another indication that the Legislature shares the view that section 825's proviso comprises a 48-hour period, subject to extension when it expires on a weekend or holiday or at a "time" when court is not in session. The first of the two references in section 824 to "48 hours" also supports this characterization of the period in question. In analyzing the need for enactment of section 824, numerous legislative reports referred to section 825 as having established a 48-hour rule. For example, the analysis of Assembly Bill No. 1303 by the Assembly Committee on Criminal Justice states: "Because of the 48 hour time limit imposed by the present statutes, some adults who are arrested for serious

crimes are released from custody." The analysis of the bill by the Senate Committee on Judiciary, while referring to the requirement "that an adult defendant be brought before a magistrate within two days of her or his arrest," proceeds under the caption "Need for legislation" to observe: "Because at this time the present 48-hour limitation for filing complaints has often passed, some adult arrestees . . . must be released from custody." Similarly the third-reading analyses of Assembly Bill No. 1303 by both the Senate Democratic Caucus and the Senate Republican Caucus refer to "the present 48-hour limitation."

From the foregoing, I conclude that in enacting the 1961 amendment to section 825, the Legislature contemplated the calculation of a 48-hour period, excluding weekends and holidays, beginning at the time of arrest.[9] If this 48-hour period expires "at a time when the court . . . is not in session," the maximum period of detention extends to the end of the next regular court session on the following judicial day; if the period expires when court is in session, the arraignment must take place at some time during that session.[10]

### B. *What Constitutes "Unnecessary Delay"*

The trial court's written statement of decision interpreted case authority as "suggest[ing] that where the investigative delay is for a 'good' purpose (making sure you have the right man) instead of a 'bad' purpose (sweating a confession out of the defendant), a reasonable delay for investigation is permitted as 'necessary.'" The trial court therefore ruled that "time neces-

---

[9] Respondents claim that such an interpretation of section 825 would occasionally create anomalies as to the time similarly situated arrestees are initially brought to court. However, such differences in treatment would also result from the rule adopted by the majority and from any other practicable rule. Differences in treatment resulting from minor differences in circumstances unavoidably result from any statute which establishes fixed time limits for the performance of an act. The apparent severity of any disparity in treatment is significantly lessened by the circumstance that section 825 establishes the fixed time period only as an *outside* limit in which each defendant must be brought to court. The basic limitation applicable under the statute in all situations is that the arrestee be "taken before the magistrate without unnecessary delay." (§ 825; *People* v. *Pettingill, supra,* 21 Cal.3d 231, 243.)

[10] While the LAPD due-out schedule would require that a person arrested at 9:30 a.m. Monday be arraigned by 9:30 a.m. Wednesday, as appellant agreed at oral argument there is no authority requiring that an arraignment be conducted by a particular hour during a court session. Such a rule could have the absurd result of fostering interruptions of the court's calendar call by counsel requesting priority as the minute hand of the courtroom clock approaches the 48-hour anniversary of his client's arrest. It must be assumed that such a result was not intended by the Legislature. As observed in other contexts, "the law does not take fractions of a day into account unless provision is specifically made for them. [Citation.] When an act must be performed on a specified day, performance does not relate to any particular time of day but extends throughout the day." (*Green* v. *American Cas. Co.* (1971) 17 Cal.App.3d 270, 273 [94 Cal.Rptr. 528].) "Courts may have to count days, but they are not required to count hours and minutes . . . ." (*Gordon* v. *Wolfe* (1986) 179 Cal.App.3d 162, 166 [224 Cal.Rptr. 481].)

sary to conduct a follow-up investigation where necessary for District Attorney evaluation of the case is a necessary delay, except where the purpose is to interrogate the defendant." However, the court imposed a requirement that the follow-up investigation in *all cases* in which the felony arrestee remains in custody *"be completed no later than the first court day after arrest."* The court below ruled additionally: "Scientific and laboratory work, not necessary to determine the charge against a defendant, will . . . involve 'an unnecessary delay.' . . . [¶] Accumulation of cases by detectives so as to reduce the number of time-consuming trips to the District Attorney's office must be classified as 'unnecessary' unless the delay is minimal— a matter of hours. However, a delay to the next day in causing the arraignment of a defendant must be classified as unreasonable and therefore unnecessary if done merely to complete investigation in other cases. [¶] The court holds that failure to arraign a defendant on the day of a prosecutor's decision to charge a defendant is an unnecessary delay if there remained time in that day to arraign the defendant. . . . The court finds that it is feasible for the LAPD to cause same-day arraignment to be made in cases where the filing decision is made during the morning or very early afternoon hours."

The majority upholds every aspect of the trial court's holding that LAPD's routine policies cause "unnecessary delay" in bringing felony in-custody arrestees before a magistrate. For the reasons that follow, I must voice disagreement with certain conclusions reached by the trial court.

Where an arrest is made without a warrant, section 849 directs that at the time the arrestee is taken to court, "a complaint stating the charge against the arrested person shall be laid before such magistrate." In such cases, therefore, the arrestee's appearance in court will necessarily be delayed during the time it takes to determine whether such a complaint should be filed and, where such a determination is made, to physically prepare the document. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 327 [165 Cal.Rptr. 289, 611 P.2d 883]; *Stanley* v. *Justice Court, supra,* 55 Cal.App.3d 244, 250.) But while it is unquestioned that the arrestee may be kept in custody for a reasonable period of time not exceeding the aforementioned statutory period while the case is presented to the prosecuting attorney and evaluated by him to determine what charges, if any, should be filed, previous cases have not clarified the extent to which further *investigation* can properly constitute a part of this process of determining whether charges should be filed.

In *People* v. *Thompson, supra,* 27 Cal.3d at page 329, the California Supreme Court cited with approval the court's observation in *People* v. *Williams, supra,* 68 Cal.App.3d 36, 43, that "There is no authority to delay for the purpose of investigating the case." But the next sentence of the

*Williams* opinion recognized that delay is allowed "for the district attorney to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed." The statement in *Williams,* as to the absence of authority for delay for the purpose of investigating the case, was unsupported by any analysis and unnecessary to the decision, since the record in that case failed to disclose "any reason whatsoever" for the delay. (*People* v. *Williams, supra,* 68 Cal.App.3d at p. 43.) Quotation of this language in *People* v. *Thompson,* pertaining to whether further investigation would justify delay, was also unnecessary to the decision and therefore dictum since the issue before the court in *Thompson* was whether the arrestee's appearance before a magistrate could properly be delayed so that the arresting officer could get some sleep. Such a delay was held "unnecessary." (27 Cal.3d at pp. 328-329.)

An important factor apparently not considered by the courts in *Williams* and *Thompson* is that the existence of a reasonable suspicion of guilt justifying an arrest is not by itself a sufficient basis upon which to determine whether criminal charges should be filed. Further investigation will frequently be required either to confirm or refute the arresting officer's initial conclusions and for the purpose of determining which charges, if any, should be filed. (See Gov. Code, § 26501.) The foregoing decision by the district attorney must be based on the presence or absence of sufficient evidence to *convict* the accused of the charge in question.[11] On the other

---

[11] The time and effort that must go into a prosecutor's filing decision is apparent from the Uniform Crime Charging Standards (1974) California District Attorneys Association, page 13: "The primary responsibility of a prosecutor in charging is to determine whether or not there is sufficient evidence to convict the accused of the particular crime in question and to authorize the filing of appropriate charges.

"1. *Basic criteria for charging*

"The prosecutor should charge only if the following four basic requirements are satisfied:

"a. The prosecutor, based on a complete investigation and a thorough consideration of all pertinent data readily available to him, is satisfied that the evidence shows the accused is guilty of the crime to be charged.

"b. There is legally sufficient, admissible evidence of a corpus delicti.

"c. There is legally sufficient, admissible evidence of the accused's identity as the perpetrator of the crime charged.

"d. The prosecutor has considered the probability of conviction by an objective fact-finder hearing the admissible evidence. The admissible evidence should be of such convincing force that it would warrant conviction of the crime charged by a reasonable and objective fact-finder after hearing all the evidence available to the prosecutor at the time of charging and after hearing the most plausible, reasonably foreseeable defense that could be raised under the evidence presented to the prosecutor.

"Commentary

"The prosecutor should go through this four-step process in evaluating a case even though these steps are integrally related and the issues often overlap. This four-step process will help prevent the filing of inadequate cases because the failure to consider one or more of these issues separately could cause a prosecutor to overlook an issue or problem in the case." (See also 1 ABA Standards for Criminal Justice, std. 3-3.9 (2d ed. 1980) pp. 3.53-3.59.)

hand, where sufficient evidence already exists to permit an intelligent filing decision, additional delay in arraignment to permit further investigation is rendered unnecessary, and interrogation of the defendant under such circumstances for the sole purpose of strengthening the prosecution's case has been held improper if it delays the arraignment. However, interrogation of the arrestee may still be proper where "reasonably prompted by a concern for the public safety" (*New York* v. *Quarles* (1984) 467 U.S. 649, 656 [81 L.Ed.2d 550, 557, 104 S.Ct. 2626]), such as the need to locate a missing victim (see *People* v. *Modesto* (1965) 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753]), or to confirm exculpatory information which could "exonerate the arrestee and obviate the need for formal criminal proceedings" (*Stanley* v. *Justice Court, supra,* 55 Cal.App.3d at p. 250), thereby leading to the suspect's release.

In *People* v. *Powell, supra,* 67 Cal.2d 32, 60-61, the court characterized as improper a delay in arraignment for the purpose of conducting further interrogation. The two suspects in *Powell* were placed under arrest for the murder of a police officer and the attempted murder of a second officer, and both suspects immediately made voluntary statements implicating themselves in the crime but accusing each other of shooting the officers. The suspects were not brought before a magistrate until three days later, during which time eight increasingly incriminatory statements were obtained from each of them. The Supreme Court's opinion condemned the practice followed in the investigation.

The decision in *Powell,* however, has not been interpreted to prohibit all delay in arraignment resulting from interrogation of in-custody suspects. In *People* v. *King* (1969) 270 Cal.App.2d 817 [76 Cal.Rptr. 145], the defendant and four other suspects were arrested for murder. The defendant was interrogated and gave an incriminating statement prior to his arraignment on the second court day following his arrest. Focusing on the intent of the police, the court found no unnecessary delay: "The delay in arraignment appears to have been brought about, not for the purpose of eliciting damaging statements from an accused, but rather for the purpose of untangling a skein of circumstantial evidence which implicated five suspects in varying degrees and rationally determining from the weight of available evidence which of the five suspects should be publicly charged with murder. The circumstances are thus quite different from those in *Powell, supra* . . . ."

The trial court's findings reflect that filing standards closely paralleling the foregoing are routinely followed in Los Angeles County. The district attorney carefully examines the case prior to filing so as to (1) minimize unnecessary incarceration of suspects in weak cases which should not be filed, (2) maximize the prosecutor's efficiency by giving priority to cases in which conviction is most likely, and (3) avoid overcharging in view of the limitations on plea bargaining imposed by section 1192.7.

(*Id.,* at p. 823.) Delay for investigation which included an attempt to obtain admissions from the suspect was also found permissible in *People* v. *Lee, supra,* 3 Cal.App.3d at pages 519-522 (multiple interrogations over a four-day period prior to arraignment), and *People* v. *Ross, supra,* 236 Cal.App.2d at page 369 (officer spoke briefly with both suspects, then put them in adjoining cells containing a hidden microphone).

I therefore conclude that there is no basis in law for the court's prohibition of any interrogation which delays arraignment of in-custody arrestees *within* the two-day maximum period of detention allowed under section 825. In my opinion a rule is arbitrary which precludes further investigation delaying the arraignment of a jailed suspect *within* the two-day period just because that investigation includes interrogation of the suspect. Interrogation under these circumstances may be necessary in order to permit the prosecutor, quite apart from merely strengthening his case against the suspect, to make an informed decision concerning the filing of charges. The determination of what will constitute necessary or justifiable delay is best made on a case-by-case basis rather than by way of a blanket restriction.

I must also voice my disagreement with the majority's approval of the trial court's prohibition against any delay for "[s]cientific and laboratory work, not necessary to determine the charge against the defendant." The results of such investigation may be of vital importance to the prosecutor in making an informed filing decision. In some cases, for example, analysis of blood or semen samples, paint, or shoe or tire markings might exculpate a suspect. There is also no support in the applicable statutes or the cases interpreting them for the trial court's creation of a one-day limitation on follow-up investigations of any type. Determination of the permissible length of such delay must be based on the particular facts of each case. (*Stanley* v. *Justice Court, supra,* 55 Cal.App.3d 244, 250.) The only maximum limit applicable in all cases is the two-day provision embodied in section 825.

It is apparent from the evidence presented to the trial court that imposing a one-day limit on investigation could encourage the filing of charges which otherwise might have been rejected had they been further investigated, thereby prolonging the time in custody for some suspects whose cases ultimately will have to be dismissed on motion of either the prosecution or the defense. Under some circumstances, the strong interest in avoiding unnecessary prosecutions will best be served by a short delay for necessary investigation *within* the two-day period under section 825, prior to the expiration of the allowable time for filing charges and arraigning the suspect.

## II

### VISITATION RIGHTS OF PREARRAIGNMENT ARRESTEES

My principal disagreement with the second portion of the majority's opinion invalidating certain LAPD policies pertaining to the confinement of prisoners is in the area of visitation rights. With rare exceptions, both misdemeanor and felony arrestees in LAPD jails are allowed no visitors except for attorneys and bailbondsmen. These jails were not designed to include visitation facilities since detainees are held for no more than a few days. Detainees are provided at all reasonable times with either unlimited or substantial access to telephones, which can be used to make only collect calls.

The trial court held that this denial of visitation violates section 2601, subdivision (d) which confers on prisoners the right "To have personal visits . . .," since the Supreme Court in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 872 [183 Cal.Rptr. 866, 647 P.2d 142], held on equal protection grounds that "detainees retain rights at least equivalent to those guaranteed state prisoners under sections 2600 and 2601." The trial court therefore ordered the "development of a plan of visitation within the limitations of present facilities" and further required "any new jail facilities to take into account the statutory need to provide opportunities for visitation." However, the judgment rendered by the trial court goes much further than any other judicial or administrative implementation of section 2601, subdivision (d) by requiring "reasonable opportunities for visitation on *each* weekday, Saturday, Sunday and holiday . . . including visitation by minor children of the arrestee in the company of a responsible adult." A "maximum of two visits *per day* for each prisoner" must be allowed under the judgment. (Italics added.)

Any attempt to apply the statutory right to visitation to the situation of *prearraignment* detainees raises obvious practical difficulties in view of the short time such individuals are held in police jail facilities. Section 2601, subdivision (d) does not specify how often such visits must be allowed, and apparently there is no authority specifically addressing the issue.

The regulations promulgated by the Board of Corrections under authority of sections 6030 and 6031 specify that *pretrial* detainees held in county jail "shall be allowed no fewer than two visits totaling at least one hour per inmate each week." (Cal. Code Regs., tit. 15, §§ 1006, subd. (b)(3), 1062.) If a comparable right of visitation of an average of one visit every three and a half days were conferred upon *prearraignment* detainees, it would frequently serve no purpose. The record in the present case demonstrates that

*misdemeanor* arrestees are brought to court, at the latest, on the court day following their arrest. Therefore, misdemeanor arrestees generally would receive no personal visits if two such visits were permitted after one week or one visit only after three and a half days. *Felony* arrestees would fare only slightly better in light of the previously discussed statutory requirements affecting the time for their arraignment. The vast majority of prearraignment detainees would still be denied a right to such visits.

Apparently in response to this dilemma, the trial court ordered that visitation be allowed on a *daily* basis. However, such an order goes far beyond the equality of treatment envisioned by the decision in *De Lancie* and in fact confers upon prearraignment detainees far greater rights to personal visits than those enjoyed either by pretrial detainees held in county jail or state prisoners.

Security considerations, which are a major factor in LAPD's jail visitation policy, must be paramount in a police department's supervision of visits to its jail facilities. (§ 2601, subd. (d); *De Lancie* v. *Superior Court, supra,* at p. 872, fn. 6.) As observed by the United States Supreme Court, custodial administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and . . . *courts should ordinarily defer to their expert judgment in such matters.'* [Citation.]" (*Bell* v. *Wolfish* (1979) 441 U.S. 520, 547-548 [60 L.Ed.2d 447, 474, 99 S.Ct. 1861], italics added.)

I submit that the majority's decision conferring upon prearraignment detainees in city jails a right of two daily visits is unjustified by any legal authority and would impose unreasonable risks and burdens upon LAPD in carrying out its responsibilities in maintaining the city jails.

### CONCLUSION

However beneficial certain improvements in procedure may seem from the standpoint of plaintiffs and others concerned with ameliorating the perceived inadequacies in municipal court arraignment procedures and the condition of city jails, our proper judicial function in the present case must be limited to determining whether the policies and procedures employed by LAPD in administering and managing its jail facilities and transporting prisoners to their initial court appearance run afoul of any provision of constitutional, statutory, administrative, or case law. I find no violations of the law in the LAPD policies and procedures addressed in this dissent.

Although many of the improvements sought by plaintiffs may be socially desirable, if they are to come into being, they should be effected appropriately by legislative enactment rather than by judicial decree.

The petition of defendants and appellants for review by the Supreme Court was denied August 18, 1988. Arguelles, J., did not participate therein. Lucas, C. J., and Panelli, J., were of the opinion that the petition should be granted.

APPENDIX

ARRESTEE RELEASE SCHEDULE

| DAY OF ARREST | TIME OF ARREST | DAY & TIME DUE OUT |
|---|---|---|
| Monday | 0001 to 0859 | Wednesday 1600 |
| | 0900 to 1600 | Wednesday time of arrest |
| | 1601 to 2400 | Thursday 1600 |
| Tuesday | 0001 to 0859 | Thursday 1600 |
| | 0900 to 1600 | Thursday time of arrest |
| | 1601 to 2400 | Friday 1600 |
| Wednesday | 0001 to 0859 | Friday 1600 |
| | 0900 to 1600 | Friday time of arrest |
| | 1601 to 2400 | Monday 1600 |
| Thursday | 0001 to 0859 | Monday 1600 |
| | 0900 to 1600 | Monday time of arrest |
| | 1601 to 2400 | Tuesday 1600 |
| Friday | 0001 to 0859 | Tuesday 1600 |
| | 0900 to 1600 | Tuesday time of arrest |
| | 1601 to 2400 | Wednesday 1600 |
| Saturday | 0001 to 0859 | Wednesday 1600 |
| | 0900 to 1600 | Wednesday 1600 |
| | 1601 to 2400 | Wednesday 1600 |
| Sunday | 0001 to 0859 | Wednesday 1600 |
| | 0900 to 1600 | Wednesday 1600 |
| | 1601 to 2400 | Wednesday 1600 |
| Holiday | 0001 to 2400 | Time commences to run at 0001 of the court day immediately following the holiday. |

NOTE: When a legal holiday occurs following the arrest, add an additional 24 hours when computing the day and time due out.